# EXHIBIT 3

Confidential - Subject to Protective Order

```
 1                UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                     NORTHERN DIVISION
 4    DANA FIELDS, Individually          )
      and as Natural Parent of D.F.,     )
 5                                       )
                    Plaintiff,           )
 6                                       )
      v.                                 ) Civil Action No.
 7                                       ) 2:13CV0035-WKW
      ELI LILLY AND COMPANY,             )
 8                                       )
                    Defendant.           )
 9    _____
10                UNITED STATES DISTRICT COURT
11         FOR THE WESTERN DISTRICT OF NORTH CAROLINA
12                    STATESVILLE DIVISION
13    ANGELA SHOEMAKE, Individually  )
      and as Parent and Natural      )
14    Guardian of Minor Child J.S.,  )
                                     )
15                  Plaintiff,       )
                                     )
16    v.                             ) Civil Action No.
                                     ) 5:13-cv-00013
17    ELI LILLY AND COMPANY,         ) RLV-DCK
                                     )
18                  Defendant.       )
      _____
19
            CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
20
21                           - - -
22     VIDEOTAPED DEPOSITION OF THOMAS W. SADLER, Ph.D.
                 WEDNESDAY, FEBRUARY 25, 2015
23
                             - - -
24
```

Golkow Technologies, Inc.                                Page 1

Confidential - Subject to Protective Order

```
 3                  Videotaped deposition of
 4    THOMAS W. SADLER, Ph.D., held at Reilly
 5    Pozner, 1900 16th Street, Suite 1700, Denver,
 6    Colorado 80202, commencing at 9:27 a.m., on
 7    February 25, 2015, before Lisa A. Knight,
 8    Registered Merit Reporter, Certified Realtime
 9    Reporter, and Notary Public.
```

- - -

Confidential - Subject to Protective Order

```
 1   A P P E A R A N C E S:
 2
     ON BEHALF OF THE PLAINTIFFS:
 3        REILLY POZNER LLP
          1900 Sixteenth Street
 4        Suite 1700
          Denver, Colorado  80202
 5        303-893-6100
          BY:  MARK PREMO-HOPKINS, ESQUIRE
 6             mpremohopkins@rplaw.com
 7
     ON BEHALF OF THE DEFENDANT:
 8        PEPPER HAMILTON LLP
          3000 Two Logan Square
 9        Eighteenth and Arch Streets
          Philadelphia, Pennsylvania  19103
10        215-981-4000
          BY:  ANDREW E. KANTRA, ESQUIRE
11             kantraa@pepperlaw.com
               FRANCIS X. LANE, ESQUIRE
12             lanefx@pepperlaw.com
13                  -and-
14        PEPPER HAMILTON LLP
          301 Carnegie Center
15        Suite 400
          Princeton, New Jersey 08543
16        609-452--0808
          BY:  RONNI E. FUCHS, ESQUIRE
17             fuchsr@pepperlaw.com
          (Appearing telephonically)
18
19
     ALSO PRESENT:
20
     DAVIS BAUMUNK, Videographer
21   Golkow Technologies
22   SHEA SHAVER, Reilly Pozner
     DALE RATLIFF, Intern
23
24
```

Golkow Technologies, Inc.                                    Page 3

Confidential - Subject to Protective Order

1    to evaluate for yourself the question of
2    whether or not various biases that may be
3    present in these epidemiologic studies may,
4    in fact, explain that increased risk?
5         A.    No, sir.  I've left that to
6    Dr. Jewell.
7         Q.    Okay.
8               In doing this analysis of the
9    epidemiological studies, your -- are you
10   familiar with something called the Bradford
11   Hill guidelines?
12        A.    Yes.  Somewhat, yes.
13        Q.    Okay.
14              And as part of your opinion
15   that you're offering here, did you undertake
16   to apply the different guidelines -- the
17   Bradford Hill guidelines?
18        A.    No, sir.
19        Q.    That, as well, was left to
20   Dr. Jewell?
21        A.    Yes, sir.
22        Q.    Okay.
23              So I just want to make sure
24   that I'm clear on your method for identifying

Confidential - Subject to Protective Order

```
 1           doesn't appear to be a page number on
 2           the first page, so . . .
 3                MR. KANTRA:  Right.  Right.
 4           Because it's a reprint.
 5                THE DEPONENT:  Okay.
 6    BY MR. KANTRA:
 7           Q.   So on that very first page, you
 8    acknowledge -- as your lead into the article
 9    is a discussion of some of the epidemiology
10    studies that have been published, right?
11           A.   Right.
12           Q.   And what you acknowledge in
13    there is that the data has been -- data,
14    positive and negative, has been reported,
15    correct?
16           A.   Correct.
17           Q.   There are mixed studies.
18           A.   Correct.
19           Q.   And that remains the case even
20    today.
21           A.   Oh, yes, sir.
22           Q.   And what you're weighing in on
23    is the question of after you've looked at the
24    data, what your opinion is of that data.
```

Confidential - Subject to Protective Order

```
 1    reasons why cardiomyopathy can happen?
 2         A.    Yes.
 3         Q.    Cardiomyopathy happens in
 4    adults and children as well as in embryos.
 5         A.    Yes.
 6               MR. PREMO-HOPKINS:  Object to
 7         form.
 8    BY MR. KANTRA:
 9         Q.    Right?
10         A.    Yes.
11         Q.    Okay.
12               In fact, it would be fair to
13    say that the etiology of cardiomyopathy is
14    extraordinarily diverse.
15               MR. PREMO-HOPKINS:  Object to
16         form, foundation.  He's not a
17         cardiologist.
18         A.    I agree, it's diverse, yes.
19    BY MR. KANTRA:
20         Q.    Okay.
21               And those different causes
22    include many different things.  Infectious
23    disease, for example, would be one example?
24         A.    Blocking serotonin receptors,
```

Case: 5:17-cv-00338-KKC Doc #: 48-3 Filed: 09/12/19 Page: 8 of 13 - Page ID#: 580
Confidential - Subject to Protective Order

1   occur that late.
2         Q.    Okay.  Okay.
3         A.    Partly for that reason.
4         Q.    Right.  And you can't grow an
5   embryo in a petri dish long enough to be able
6   to see an overt cardiac defect, right?
7         A.    That's correct.
8         Q.    So you wouldn't expect to see
9   Tetralogy of Fallot manifest in an embryo
10  culture setting.
11        A.    Well, I don't know, now that I
12  -- if I knew then what I know now, I would
13  have tried to treat some of these embryos a
14  lot earlier than we did.  And then we might
15  have been able to see outflow tract, at least
16  the beginnings of some of these
17  abnormalities.  But it would have been
18  difficult.
19        Q.    And, to your knowledge, at
20  least as of now, that has not been done.
21        A.    That's not been done.
22        Q.    Okay.
23              Now, FDA, when it reviews
24  medications for approval, doesn't rely upon

Confidential - Subject to Protective Order

1 thing. But the other thing is that we did
2 look at specific tissues to see whether we
3 could find defects or abnormalities that
4 might relate to human malformations.
5         And so we did see some
6 craniofacial changes. We saw some heart
7 changes. But mostly when we saw those, we
8 then looked at mechanisms to see whether --
9 you know, what's the mechanism for why we're
10 seeing this in the culture system? And then
11 that led -- would lead to better
12 predictability, just as Wilson says.
13     Q.    Let me ask the question a
14 little bit differently.
15         You didn't conduct those
16 studies for the purposes of evaluating
17 whether, at doses that would be therapeutic
18 in humans, you could expect to see cardiac or
19 cranio defects?
20     A.    Right. No, we didn't.
21     Q.    Okay.
22         If you were using embryo
23 cultures to evaluate that question, of
24 whether you could predict whether or not you

1  therapeutic or not.

2      Q.    Okay.

3      So really, then, it seems the

4  bottom line is that you don't know whether or

5  not the doses you were using were comparable

6  to those --

7      A.    We don't know what gets to the

8  embryo, so -- exactly in humans or -- in the

9  rodents, they have measured it a little bit

10 more, and our doses were comparable to the

11 measurements that they did for doses that

12 they used in their whole-animal studies,

13 according to the Byrd and Markum paper.

14     Q.    So the purpose of the study,

15 as you articulate it, it was not a screening

16 study for purposes --

17     A.    It was not a screening study.

18 It was a study to look at mechanisms, as I

19 said, to try to determine what the role of

20 serotonin was in development --

21     Q.    Right.

22     A.    -- and to determine what the

23 effects of blocking the ability of serotonin

24 either to be taken up and/or to signal in

Confidential - Subject to Protective Order

1    these embryos.
2         Q.    Okay.
3               So I take it from what you said
4    that not only have you not done calculations
5    to determine whether the concentrations of
6    fluoxetine that were used in your in vitro
7    studies, how those compare to what a human
8    embryo is exposed to, but you're suggesting
9    that that kind of calculation could not be
10   done.
11        A.    Well, I don't think you can
12   measure the levels of these drugs directly in
13   a human embryo because it wouldn't be
14   ethically possible.
15        Q.    Right.  Right.  Right.  Okay.
16        A.    We know that these drugs get
17   across the placenta --
18        Q.    Right.
19        A.    -- so we know they get to the
20   embryo.
21        Q.    But in terms of being able to
22   say more than that . . .
23        A.    And a therapeutic dose in an
24   embryo that would cause a malformation, we

Confidential - Subject to Protective Order

```
 1    reported in both.
 2         A.    Both, yes.
 3         Q.    Okay.  All right.
 4               And proliferation alone is not
 5    a birth defect, correct?
 6         A.    No.  It's a mechanism.
 7         Q.    Cells proliferate for lots of
 8    different reasons.
 9         A.    Well, they proliferate to grow,
10    I mean, to make more cells.  So one of the
11    needs of an embryo is to have cell
12    proliferation --
13         Q.    Right.
14         A.    -- so that -- and then there
15    are many different ways to affect cell
16    proliferation, which is what we'd probably
17    call a mechanism.
18               If the cells stop
19    proliferating, that would probably be called
20    a pathogenic, not a mechanistic, effect.  But
21    if you disrupt cell proliferation, in most
22    cases, you wind up with malformations.
23         Q.    So in the -- in this study,
24    there was proliferation that was reported,
```

Confidential - Subject to Protective Order

1   but there was no overt cardiac defect that
2   was observed for the reasons that we talked
3   about earlier.  These studies could not and
4   weren't set up to find overt cardiac defects.
5        A.    Right.  We can't grow the
6   embryos long enough in this system to see the
7   cardiac -- not the overt structural cardiac
8   defects that you would -- like we've talked
9   about.
10       Q.    Okay.
11             And the conclusions that you
12  made in this particular paper, as you can see
13  at the end of the abstract on page 1, is that
14  all the results that you've described here,
15  both in the myocardium and the endocardial
16  cushions, taken together suggest serotonin
17  may play a role in cardiac morphogenesis
18  during endocardial cushion formation.  Right?
19       A.    Yes.
20       Q.    And was there a conclusion with
21  respect to the myocardium as well or was it
22  just with respect to the endocardial cushion
23  formation?
24       A.    It was focused more on the